# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EAGLE FORCE HOLDINGS, LLC, a Delaware limited liability company, and EF INVESTMENTS, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 10803-VCMR |
| v. | ) ) | |
| STANLEY V. CAMPBELL, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 28, 2017
Date Decided: September 1, 2017

Frank E. Noyes, II, OFFIT KURMAN, P.A., Wilmington, Delaware; Harold M. Walter, OFFIT KURMAN, P.A., Baltimore, Maryland; *Attorneys for Plaintiffs.*

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware; *Attorney for Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In 2013, Richard Kay and Stanley Campbell decided to form a business venture to market certain medical diagnosis and prescription technology that Campbell had developed. The parties outlined the principal terms of the investment through two letter agreements in November 2013 and April 2014. Under the principal terms, Kay and Campbell would form a new limited liability company of which they would each be 50% members. Campbell would contribute the stock of EagleForce Associates, Inc., a Virginia corporation, ("EagleForce Associates") and the membership interests of EagleForce Health, LLC, a Virginia limited liability company, ("EagleForce Health") along with certain other intellectual property. Kay would contribute cash. For many months, the parties negotiated several key terms of the transaction documents for the new venture. In the meantime, Kay contributed cash to EagleForce Associates without a formal agreement in place in order to keep the company afloat.

On August 28, 2014, Kay and Campbell signed the transaction documents, which included an operating agreement for Eagle Force Holdings, LLC, a Delaware limited liability company, ("Eagle Force Holdings") and a contribution agreement. The parties dispute what occurred at the August 28 meeting. Plaintiffs assert that the parties formed binding contracts at the August 28 meeting. Campbell contends that his signature was meant to indicate receipt of the latest drafts of the agreements but not to manifest his assent to their terms. Campbell also argues that the

1

transaction documents lack certain essential terms on which the parties had not yet come to agreement, including representations regarding Campbell's ownership of the intellectual property, stock of EagleForce Associates, and membership interests of EagleForce Health.

After a fact-intensive inquiry, this Court holds in this post-trial opinion that the transaction documents do not represent an enforceable contract because the parties failed to come to agreement on certain terms that the parties regarded as essential. The only basis for this Court's personal jurisdiction over the defendant is consent through forum selection clauses in the contribution agreement and the limited liability company agreement. Because Campbell is not bound by the forum selection clauses, this case is dismissed for lack of personal jurisdiction.

## I.    BACKGROUND

The facts in this opinion are my findings based on the parties' stipulations, 152 trial exhibits, including deposition transcripts, and the testimony of ten witnesses presented at a five-day trial before this Court that began on February 6, 2017. Additionally, the Court considers Campbell's testimony and the documentary evidence presented at the evidentiary hearings that this Court held on August 31,

2016, September 8, 2016, May 5, 2017, and August 28, 2017.  I grant the evidence the weight and credibility that I find it deserves.[1]

### A.    Parties and Relevant Non-Parties

Richard Kay is a businessman and investor in the Washington, DC metropolitan area.  Since 2005, Kay has owned a government contracting company called Sentrillion with other partners.[2]  Kay also controls Plaintiff EF Investments, LLC, a Delaware limited liability company ("EF Investments").

Defendant Stanley Campbell controls EagleForce Associates and EagleForce Health.  EagleForce Associates is a start-up company that Campbell intended to use to market a pharmaceutical software system called PADRE.[3]  PADRE aggregates medical information about patients to assist in determining which medications to prescribe to those patients.  It also monitors pharmaceutical sales for compliance with federal law.[4]

---

[1]    Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker.  After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr."  No disrespect is intended.  Exhibits are cited as "JX #."  Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs, and citations to the oral argument transcript refer to the post-trial oral argument.

[2]    Tr. 18 (Offit).

[3]    *Id.* at 775 (Campbell).

[4]    *Id.* at 766.

Plaintiff Eagle Force Holdings is a Delaware limited liability company created by Kay to serve as the holding company for the operating EagleForce businesses. The Amended and Restated Limited Liability Company Agreement of Eagle Force Holdings (the "LLC Agreement") contemplates that Campbell and EF Investments will each own 50% of the membership interests in Eagle Force Holdings.[5] The Contribution and Assignment Agreement that Kay and Campbell began to negotiate (the "Contribution Agreement," together with the LLC Agreement, the "Transaction Documents") contemplates that EagleForce Associates and EagleForce Health will be subsidiaries of Eagle Force Holdings.[6]

Donald Rogers is an attorney who represented Campbell through key parts of his negotiations with Kay.[7]

Theodore Offit is an attorney who represented Kay in the negotiations with Campbell.[8]

---

[5]    *See* JX 79.

[6]    JX 78.

[7]    Tr. 817-18 (Rogers).

[8]    *See id.* at 19 (Offit).

4

Said S. Salah is the Vice President of Finance and CFO of EagleForce Associates.[9] From January 2016 until July 2017, he lived overseas and tapered off his services to EagleForce Associates.[10]

General John W. Morgan III is a Senior Vice President of EagleForce Associates and EagleForce Health.[11]

Christopher Cresswell is the General Manager of EagleForce Health.[12]

Jashuva Variganti is an employee of EagleForce Associates.[13]

Katrina Powers is an employee of Sentrilion.[14]

## B. Facts

Campbell first met Kay through a mutual friend in 2005 or 2006 when Campbell was seeking an investor for an earlier iteration of EagleForce Associates.[15] Kay did not invest in the earlier EagleForce venture, but in 2009, Campbell

---

[9] *Id.* at 1086 (Salah).

[10] *Id.*; Aug. 28, 2017 Hr'g Tr. 27.

[11] Tr. 1166 (Morgan).

[12] May 5, 2017 Hr'g Ex. 6.

[13] Tr. 716 (Variganti).

[14] *Id.* at 246-47 (Powers).

[15] *Id.* at 768 (Campbell).

approached Kay again about investing in a bomb detection technology.[16]  Those negotiations also did not lead to a deal.

In January 2013, Campbell needed capital to market his PADRE technology through EagleForce Associates.  Before approaching Kay again, Campbell met Said Salah who had experience with government contracting.[17]  Campbell hired him to work with EagleForce Associates, and in May 2013, Salah and Campbell negotiated an employment agreement for Salah.  Under Salah's employment agreement, he is "eligible to earn equity participation by demonstrating a sustained ability to attain specific sales, operations, and management goals."[18]  The only goal mentioned in the employment agreement is to "generate prorated new business sales of at least $6.0 million over the next two years."[19]  The agreement states that Salah is eligible to earn 2.5% of the equity of EagleForce Associates.[20]  Salah also loaned money to EagleForce Associates and deferred collection of his salary to provide EagleForce Associates with cash needed for its operations.[21]  In the same month, Salah's brother,

---

[16]    *Id.* at 770-71.

[17]    *Id.* at 1094 (Salah).

[18]    May 5, 2017 Hr'g Ex. 6.

[19]    *Id.*

[20]    Tr. 1093-94 (Salah); May 5, 2017 Hr'g Ex. 6.

[21]    Tr. 1091, 1094-95 (Salah).

Haney Salah, signed an employment agreement to become the Chief Medical Officer of EagleForce Associates. His employment agreement contains the same eligibility requirements for equity participation, but Haney is entitled to 1.5% of the EagleForce Associates equity upon satisfying those requirements.[22]

Campbell signed Salah's employment agreement, and Salah testified that Kay also saw the agreement and was aware of his claim to equity in EagleForce Associates.[23]

### 1. The November 2013 letter agreement

In or around November 2013, Campbell approached Kay about investing in EagleForce Associates for the purpose of marketing the PADRE software.[24] EagleForce Associates recently had been denied a government contract, and Campbell believed that with adequate capitalization, EagleForce Associates would be more attractive as a government contractor.[25]

Kay was interested in investing in EagleForce Associates, and on November 27, 2013, Campbell and Kay signed a letter agreement dated November 15, 2013.[26]

---

[22] May 5, 2017 Hr'g Ex. 6; Tr. 1097 (Salah).

[23] Tr. 1094 (Salah).

[24] *Id.* at 774-75 (Campbell).

[25] *Id.* at 774.

[26] JX 1.

Kay's lawyers at the law firm Offit Kurman drafted an initial version of the November letter agreement, but Campbell and Kay independently made changes to it themselves before signing.[27] The November letter agreement contemplates that Campbell and Kay "will form a new LLC entity and/or a series of industry specific LLC's [sic] verticals in Virginia."[28] Campbell's contribution "will be PADRE source code and patents,"[29] and Kay's contribution will be at least $1.8 million in cash with the goal of raising $7.8 million in total financing to be contributed by either Kay or a mutually agreed upon investor.[30] The November letter agreement states that "[t]he company will be able to state that it has both the technology and intellectual property rights for all software and applications."[31] It further provides that both Campbell and Kay will own 50% of the new LLC and that they will "never dilute [their combined stake to] less than 50.1% together in order to maintain control. They will also agree that their vote will always be uniformly tied as a single vote

---

[27]     Tr. 131 (Offit).

[28]     JX 1, ¶ 2.

[29]     *Id.* ¶ 7.

[30]     *Id.* ¶ 6.

[31]     *Id.* ¶ 7.

8

thus protecting [Campbell] from complete loss of control."[32] Further, Campbell will be entitled to a priority return of $1.8 million before Kay receives a distribution.[33]

Under the November letter agreement, both Campbell and Kay would be involved in managing the new LLC and "will confer on all business and marketing related activities as well as all capital needs."[34] The new LLC's board will have two Campbell designees, two Kay designees, and a fifth member upon which Kay and Campbell will agree.[35] All of the material terms of the November letter agreement were subject to due diligence.[36]

## 2. The April 2014 letter agreement

After executing the November 2013 agreement, Kay and Campbell continued to negotiate. On March 17, 2014, Kay filed a certificate of formation for Eagle Force Holdings in Delaware.[37] At that time, Kay did not tell Campbell he had formed the Eagle Force Holdings entity; nor did he inform Campbell that the entity was established in Delaware rather than Virginia, as the November letter agreement

---

[32] *Id.* ¶ 5.

[33] *Id.* ¶ 10.

[34] *Id.* ¶ 4.

[35] *Id.* ¶ 11.

[36] *Id.* ¶¶ 6, 8, 10.

[37] JX 7.

stated.[38] But on April 4, 2014, Kay and Campbell signed an amendment to the November letter agreement, which stated "[b]y April 21 it is anticipated that a new LLC will be formed to serve as a parent entity ('Holdco') for Eagle Force Associates, Inc. and the recently formed Eagle Force Health Solutions, LLC . . . ."[39]

Kay and Campbell signed the April 4, 2014 letter agreement without counsel present.[40] The April letter agreement "amends the letter agreement that [Campbell and Kay] executed on November 27, 2013 that was dated as of November 15, 2013."[41] The April letter agreement maintained that Campbell and Kay would share management responsibilities and confer regarding marketing and capital needs.[42] But it also further defined Campbell's and Kay's roles in the anticipated parent company, referred to as "Holdco." The April letter agreement stated that

> [Campbell] will have primary responsibility over all information technology, product development, R&D, and customer service and maintenance, in each case subject to an annual budget approved by the Holdco board. [Kay] will have primary responsibility over financial matters, personnel/HR, and management of outside accounting, legal, tax and other advisors and consultants as well as all other matters relating to the operation of the business of

---

[38] Tr. 991-92 (Campbell).

[39] JX 12, ¶ 2.

[40] Tr. 380-81 (Kay).

[41] JX 12.

[42] *Id.* ¶ 4.

Holdco and its subsidiaries and will consult with [Campbell] on all decisions affecting these functions.[43]

The April letter agreement contemplated that Campbell would remain entitled to a priority return of his capital,[44] 50% ownership of "Holdco," and Kay's agreement that Kay and Campbell together would not be diluted below 51% of "Holdco," a slightly higher threshold than the 50.1% in the November letter agreement.[45] The parties referred to the more defined spheres of management responsibility in the anticipated 50-50 partnership as "swim lanes."[46]

Both the November 2013 and the April 2014 letter agreements contemplated that Campbell and Kay would sign an operating agreement for the new LLC "Holdco."[47] The April letter agreement provides that "[Campbell] will, at execution of the Holdco LLC operating agreement, make customary representations to [Kay] regarding Holdco's free and clear right, title and interest to 100% of such Stanley referenced IP . . . ."[48] "Stanley IP" is defined in the letter agreement as "all software and source code . . . invented, developed or created, directly or indirectly, by

---

[43]     *Id.* ¶ 3.

[44]     *Id.* ¶ 10.

[45]     *Id.* ¶ 5.

[46]     Tr. 319 (Kay).

[47]     JX 1, ¶ 8; JX 12, ¶ 8.

[48]     JX 12, ¶ 7.

11

[Campbell], in whole or in part, alone or in conjunction with others (including specifically Eagle Force Associates, Inc. . . . ."[49]

Recognizing that Kay and Campbell had not yet agreed to a "Holdco" operating agreement, the April letter agreement provides that Kay will advance $500,000 to Eagle Force Holdings upon the execution of the letter agreement. And "[t]his $500,000 will be evidenced by a demand promissory note issued to [Kay] by Eagle Force Associates, Inc. and Eagle Force Health Solutions, LLC, jointly and severally . . . ."[50] The evidence does not show that Kay received such a note until July 7, 2014, as discussed below. The April letter agreement also contemplates that once Kay and Campbell agree to the "Holdco" LLC agreement, Kay will contribute an additional $1,800,000 to equal the value of Campbell's intellectual property, $2,300,000.[51] Also at that time, Campbell will receive a $500,000 distribution from "Holdco" for his personal use.[52]

---

[49]     *Id.*

[50]     *Id.* ¶ 6.

[51]     *Id.*

[52]     *Id.*

### 3.     The EagleForce businesses hire Cresswell and Morgan

In May 2014, EagleForce Health entered an employment agreement with Christopher Cresswell under which Cresswell became General Manager of EagleForce Health.[53]  Cresswell's employment agreement provides that he is

> eligible for equity participation in EagleForce [Health] Stock Appreciation Rights (SAR's) plan.  [Cresswell] will be eligible to earn equity participation as granted by the Board of Directors in the amount of 5% non-voting interest in the company of which 2.5% will be authorized and not issued on execution of this agreement and the remaining 2.5% shall vest equally based on tenure on a prorated basis over the next 3 years.  Any outstanding unauthorized SARs shall automatically vest for any change in control or termination without cause.[54]

Cresswell testified that he understood that his agreement provided him with a right to 5% of the equity of EagleForce Health but that the equity would be expressed as SARs for tax purposes.[55]  Cresswell had not seen a SARs plan but testified that Kay told him that his equity would take the form of SARs.[56]

In the same month, EagleForce Associates and EagleForce Health hired General John W. Morgan III as a Senior Vice President.  Morgan's employment agreement provides that he is

---

[53]     May 5, 2017 Hr'g Ex. 6.

[54]     *Id.*

[55]     Tr. 652 (Cresswell).

[56]     *Id.* at 653.

13

eligible for equity participation in EagleForce Associates, Inc. Stock Appreciation Rights (SAR's) plan. [Morgan] will be eligible to earn equity participation as granted by the Board of Directors in the amount of 300,000 SAR's (150,000 each) valued [sic] one dollar ($1) per SAR. . . . SAR's will vest based on both tenure and contribution/revenue achievements. Any sale of EagleForce prior to the 3 year vesting shall result in 100% of [Morgan's] shares automatically vesting provided [that Morgan is] still employed by EagleForce or Terminated without "Cause."[57]

As such, Cresswell and Morgan were both entitled to immediate vesting of any SARs they had been granted upon a sale or change of control of the EagleForce businesses.

### 4. Kay becomes involved in the EagleForce Associates business

As Kay was conducting due diligence on the EagleForce Associates business, he continued to provide funding to EagleForce Associates[58] and became involved in certain aspects of the day-to-day operations of the company. For example, Kay suggested that Melinda Walker be hired as a secretary at EagleForce Associates.[59] She was paid $75,000 per year, which concerned Campbell because it was a higher salary than most EagleForce Associates employees earned at the time.[60] Additionally, in October 2014, Katrina Powers, a Sentrillion employee, and Jashuva

---

[57]  May 5, 2017 Hr'g Ex. 6.

[58]  JX 106.

[59]  Tr. 436 (Kay).

[60]  *Id.* at 917-19 (Campbell).

14

Variganti, an EagleForce Associates employee, established a new account at Paychex, a payroll service, for the EagleForce Associates payroll to which Campbell did not have access.[61]

As Kay became more involved in EagleForce Associates, Kay and Campbell's relationship began to sour. In an April 30, 2014 email exchange, Kay advised Campbell that Bryan Ackerman, Sentrillion's General Counsel, would be involved in all contracts into which EagleForce Associates entered. Campbell, in contrast, wanted Salah to have a greater role. He wrote to Kay, "I am no longer enjoying coming to work. I do not think this will work. Please tell me what I owe you and how we can move forward independently."[62] Kay responded referring to the November and April letter agreements and stating, "[m]y position is we are signed partners . . . ."[63] Additionally, Kay began to speak with EagleForce Associates employees about embarrassing aspects of Campbell's past. For example, at some point between March and August of 2014, Kay met with Cresswell at a country club in Potomac, Maryland and told Cresswell that Campbell had previously committed

---

[61]     *Id.* at 739-40 (Variganti); *id.* at 949-50 (Campbell).

[62]     JX 130.

[63]     *Id.*

fraud.[64]  And Kay did not get along personally with certain EagleForce employees, particularly Salah.[65]

### 5.    Campbell and Kay begin to negotiate the LLC Agreement and the Contribution Agreement

Despite the fact that Kay and Campbell's relationship had become strained, they began to negotiate the LLC Agreement for Eagle Force Holdings—which mirrored the structure of the "Holdco" entity referenced in the April 2014 letter agreement—and the Contribution Agreement.  In addition to Offit Kurman, Kay engaged Latham & Watkins to advise him on investing in the EagleForce business. Michael Schlesinger of Latham & Watkins advised Campbell that he should retain his own counsel,[66] and in or around April 2014, Campbell retained Donald Rogers with the Schulman Rogers law firm.[67]

On May 13, 2014, Latham & Watkins presented a draft Contribution Agreement and a draft LLC Agreement for Eagle Force Holdings to Campbell.[68] The LLC Agreement referred to the March 17, 2014 certificate of formation for

---

[64]    Tr. 656-59 (Cresswell).

[65]    *Id.* at 1087-88 (Salah); *id.* at 1174 (Morgan).

[66]    Tr. 795 (Campbell).

[67]    *Id.* at 817 (Rogers).

[68]    JX 14; JX 15.

16

Eagle Force Holdings that was filed in Delaware.[69] Campbell, thus, was aware that Kay formed Eagle Force Holdings in Delaware at least by May 13, 2014. The agreement included a forum selection clause consenting to personal jurisdiction in the Delaware courts and an arbitration clause.[70] The Latham & Watkins May 13, 2014 draft also included a first priority return of capital for any contributions made after the date of the LLC Agreement.[71]

On June 30, 2014, Rogers sent revised drafts of the LLC Agreement and the Contribution Agreement to Offit.[72] The drafts included several notes indicating that certain points needed to be discussed such as the distribution waterfall and the structure of Campbell's contribution of intellectual property.[73] It also added a protection against dilution for Campbell arising from any additional capital contributions until such contributions exceed $5.5 million.[74] And the June 30 draft

---

[69]     JX 15 Recitals.

[70]     *Id.* art. XII.

[71]     *Id.* § 5.1.

[72]     JX 17.

[73]     JX 18, § 3.2.1; JX 19, § 5.1.2.

[74]     JX 18, § 3.2.

added the requirement that for the Eagle Force Holdings board to act, Campbell and Kay both must vote in favor of the board action.[75]

Also on June 30, 2014, Campbell received an email from Kay that Campbell believed contained a racial slur.[76] Kay maintains that the word was a typographical error.[77] I need not find what the email was intended to say because I consider it only for the fact that Campbell had reservations about Kay's character, and from Campbell's perspective, his personal relationship with Kay continued to deteriorate. Whether such reservations were justified has no bearing on this case. Despite Campbell's reservations, he continued his business relationship with Kay; EagleForce Associates continued to receive funding from Kay; and the parties continued to negotiate the Transaction Documents.

### 6. The July 7, 2014 meeting

On July 3, 2014, Offit sent Rogers an email confirming a meeting on July 7, 2014 at Rogers's office to negotiate the Transaction Documents. Offit expressed his and Kay's concern that the negotiations were proceeding slowly, and Rogers

---

[75] *Id.* § 4.1.3.

[76] JX 16.

[77] Tr. 444 (Kay).

18

responded that "[f]or the benefit of everyone, let's make Monday [July 7] the day we agree on all terms."[78]

On July 7, 2014, Kay, Campbell, and their counsel met at Rogers's office to negotiate the unsettled terms of the Contribution Agreement and the LLC Agreement.[79] Offit believed that at the beginning of the meeting, three primary issues remained to be negotiated. First, the parties had not come to agreement on the scope of the intellectual property that Campbell would contribute and the extent of the representation Campbell would make regarding his ownership of the intellectual property and any third-party infringement.[80] Second, because Campbell believed that the EagleForce business required $7.8 million in cash to be successful, and Kay planned to contribute only $2.3 million, the parties had to negotiate how Kay and Campbell's interests would be diluted by an additional $5.5 million investment.[81] Third, the structure of the Eagle Force Holdings board of directors needed to be decided. The parties had not yet agreed whether Kay and Campbell

---

[78] JX 24.

[79] Tr. 476 (Kay).

[80] *Id.* at 62 (Offit).

[81] *Id.* at 63; *see* JX 18, § 3.2 (Schulman Rogers June 30, 2014 draft LLC Agreement).

19

would be the only directors or whether a third director would be elected to break deadlock between the parties.[82]

The July 7 meeting went late into the night, and the parties resolved the three issues that Offit understood to be outstanding. As to the scope of the intellectual property Campbell would contribute, the parties agreed that he would contribute all of the intellectual property he had created that was related to the EagleForce business.[83] They agreed that Campbell and Kay would not be diluted at the Eagle Force Holdings level but that they would attempt to raise the additional $5.5 million in capital by selling up to 20% of the equity of each subsidiary of Eagle Force Holdings.[84] And they agreed that Campbell and Kay would be the sole directors of Eagle Force Holdings, but the subsidiaries would have a three-person board with an additional independent director.[85] While those issues were resolved at the July 7 meeting,[86] a substantial new issue arose. During that meeting, Offit discovered for the first time that Campbell had previously filed for bankruptcy, which made Offit

---

[82] Tr. 63 (Offit).

[83] *Id.* at 64-66; *see* JX 42, Sched. 2.2(b) (Schulman Rogers July 14, 2014 draft Contribution Agreement).

[84] Tr. 64-66 (Offit).

[85] *Id.* at 64-66; *see* JX 30, § 4.1.8 (Schulman Rogers July 9, 2014 draft LLC Agreement).

[86] Tr. 63-64 (Offit).

concerned about Campbell's title to the property he was planning to contribute to Eagle Force Holdings.[87] The next day, Offit discovered through consultation with a bankruptcy attorney at his firm that debt had been discharged in Campbell's bankruptcy and that Campbell had not listed the PADRE intellectual property as an asset on the schedules to his bankruptcy petition.[88] Kay's counsel wanted Campbell to reopen his bankruptcy and amend the petition to include the intellectual property that had previously been omitted.[89] At trial, Campbell testified that he did not want to reopen his bankruptcy after he learned that having two bankruptcy proceedings on his record might make future investors uncomfortable with his participation in EagleForce management.[90]

At the end of the July 7 meeting, Kay and Campbell signed signature pages, which their attorneys kept in escrow and planned to exchange when Kay and Campbell came to agreement.[91] The purpose of the signature pages was to avoid the need to reconvene to sign the Contribution Agreement and the LLC Agreement.[92]

---

[87]     *Id.* at 70.

[88]     *Id.* at 73; JX 32.

[89]     Tr. 79 (Offit).

[90]     *Id.* at 995-96 (Campbell).

[91]     *Id.* at 68 (Offit); JX 115.

[92]     Tr. 68 (Offit).

At the July 7 meeting, no one discussed whether the attorneys' exchange of the signature pages constituted the only means by which they could come to agreement on this deal.[93] Kay testified that he did not believe that an exchange of the signature pages was the only way the parties could form a binding agreement.[94]

Also on July 7, Campbell signed an EagleForce Associates note payable to Kay for the $700,000 that Kay had contributed to EagleForce Associates because Kay and Campbell had not yet agreed to an operating agreement for Eagle Force Holdings.[95] Kay and Campbell agreed that the note would be canceled if they were able to reach agreement on the Transaction Documents.[96]

### 7. Kay and Campbell continue to negotiate

On July 8, 2014, Offit sent Rogers a list of changes to the Contribution Agreement based on the July 7 discussion.[97] And an associate at Rogers's firm sent a redlined draft of the LLC Agreement to Offit and Kay on July 9, 2014 incorporating the negotiated terms from the July 7 meeting.[98]

---

[93] *Id.* at 69; *id.* at 827 (Rogers).

[94] Tr. 482-83 (Kay).

[95] JX 34; JX 35.

[96] JX 25.

[97] JX 28.

[98] JX 29.

22

On July 9, 2014, Campbell also sent an email to Morgan announcing that EagleForce Associates and EagleForce Health had taken on Kay as their "first Partner."[99] Morgan responded congratulating both Kay and Campbell and copying several EagleForce employees.[100] The same day, Campbell held a meeting at EagleForce Associates's offices with all of the office staff to introduce them to Kay.[101]

Throughout July 2014, Kay and Campbell continued to negotiate, and on July 22, 2014, Kay sent an email to Campbell stating, "I am hearing that you may be trying to change the deal and we now may not be consistent understanding based on our agreemnt [sic]."[102] Presumably, Kay was referring to the November and April letter agreements. Kay and Campbell then met without their lawyers and discussed open issues. On July 25, 2014, Campbell sent an email to Rogers, Offit, and Kay informing the lawyers of what Campbell and Kay had discussed. In part, Campbell wrote, "[a]s for the Issue related to Bankruptcy—I don't think I have much of an

---

[99] JX 33. Campbell testified that he did not send this email but that Melinda Walker sent it from his email account without his permission. Tr. 941-42 (Campbell). Regardless, this email does not alter the weight of the evidence.

[100] JX 33.

[101] Tr. 1188-89 (Morgan).

[102] JX 43.

23

issue . . . what we discussed and agreed is that we will pay any amount owed. I will change that to the point that we will pay any amount under $10,000."[103]

But the bankruptcy issue was not actually resolved. On August 5, 2014,[104] Campbell, Kay, Rogers, and Offit met to attempt to agree on outstanding issues. Campbell testified that Kay and Offit would not drop the bankruptcy issue[105] because they were concerned about Campbell's title to his intellectual property. To indicate that Campbell was not willing to reopen his bankruptcy, he walked out of the meeting. He testified, "I made it clear I wasn't doing that. And the only way I could make it any clearer was to leave."[106] When asked about the circumstances of that meeting, Rogers testified "[i]t may not have been clear to me, but . . . I believe we were discussing . . . the issue of the board of directors, the SARs, and the bankruptcy."[107]

On or around August 6, 2014, Kay and Campbell both signed a handwritten sheet of paper that stated, "Campbell has rights to approve new investment."[108] Offit

---

[103]    JX 46.

[104]    Tr. 80 (Offit).

[105]    *Id.* at 808 (Campbell).

[106]    *Id.*

[107]    *Id.* at 820-21 (Rogers).

[108]    JX 54.

sent an email to Rogers to clarify what Kay meant in agreeing to the handwritten note. He wrote, "[Campbell] told [Kay] he needed to be involved in all capital raise decisions. [Kay] is obviously in agreement on [Campbell's] need to be involved in capital raise matters, but [Campbell] cannot have a blocking right or veto right. The 3 person board needs to approve capital raise matters."[109]

On or before August 14, 2014, Kay and Campbell met and discussed thirteen issues on which they came to agreement. Kay handwrote[110] the thirteen points on a sheet of paper that he scanned and sent to Campbell.[111] The list of thirteen points contemplated that any new equity capital would be raised by issuing up to 17% of the equity of the Eagle Force Holdings subsidiaries, not through issuing equity of Eagle Force Holdings.[112] Eagle Force Holdings would own 80% of the subsidiaries' equity, and the remaining 3% would be used for a new employee SARs program—the details of which were still to be determined.[113] The list stated that Campbell cannot lose his salary or be fired. Further, the list provides that Campbell has no veto on new investors but that the subsidiaries will have three-person boards with

---

[109]    *Id.*

[110]    Tr. 345 (Kay).

[111]    JX 56.

[112]    *Id.*

[113]    *Id.*

Mitchell Johnson as the third person.[114]  Another one of the thirteen points provided that "[Salah] will be entitled to SAR only if [Campbell] wants to give non-voting equity.  It is from his side.  [Salah] not a CFO.  [Kay] is not obligated at all for [Salah]."[115]  The other issues on the list were operational level issues such as "[Campbell] & [Kay] will talk daily on big issues," and "[Kay] & [Campbell] agree we will push Chris Cresswell to close first 3 deals ASAP."[116]

On August 19, 2014, Rogers, Campbell's attorney, sent revised versions of the Transaction Documents.  The August 19 versions that Rogers circulated back tracked on some of Campbell's concessions in the thirteen-point list.[117]  For example, it included a veto right for Campbell with regard to new investors by requiring that "for any additional capital contribution that has been requested or accepted by a majority of the members of the board of directors or board of managers (as applicable) of a Subsidiary, Campbell must approve the terms and conditions of such additional capital contribution."[118]  Rogers's August 19 draft did incorporate some of Kay's requests, however.  For example, Rogers's August 19 version of the

---

114     *Id.*

115     *Id.*

116     *Id.*

117     JX 59.

118     *Id.* § 4.1.8(a).

26

Contribution Agreement included for the first time a provision requiring that Kay fund an escrow to pay any claims by Campbell's former creditors and that Campbell take the steps necessary to reopen his bankruptcy.[119]

On August 22, 2014, Campbell sent an email to Kay, Rogers, and Offit stating that on the bankruptcy issue, he and Kay were each willing to commit up to $5,000 to retain Campbell's personal bankruptcy lawyer and resolve the issue of his title to the intellectual property.[120] If that did not resolve the issue, Campbell agreed that out of the $500,000 distribution he would take at closing, he would "retain up to $250,000 in an attorney escrow of [his] choice for a period not to exceed 6 months."[121] Campbell was willing to set aside funds to pay any creditor claims, but he did not want to reopen a bankruptcy proceeding.

Another issue that remained open in the negotiations at the end of August was how to handle the equity rights of certain EagleForce Associates employees, including Salah, Salah's brother Haney, Cresswell, and Morgan.[122] Offit proposed that the EagleForce Associates employees with SARs or rights to equity be asked to relinquish their rights by signing a waiver and that they be told that "[a]s part of the

---

[119]     JX 57; JX 58; JX 60; Tr. 894 (Rogers).

[120]     JX 66.

[121]     *Id.*

[122]     JX 67.

27

reorganization, we will be developing new and better defined executive incentive benefits that will replace the commission program and/or stock appreciation rights (SARS) plan in which you presently participate."[123] The evidence does not show that either Campbell or Kay approached the EagleForce Associates employees to resolve this issue, and as of October 2014, both Kay and Campbell wanted the other to deal with the SARs issue.[124] In the July 22, 2014 draft of the Contribution Agreement, Offit included a specific reference to the SARs plan through adding Campbell's representation that "[e]xcept for the SARS Plan, there are no outstanding options, warrants, calls, profit sharing rights, bonus plan rights, rights of conversion or other rights, agreements, arrangements or commitments relating to Targeted Companies Securities . . . ."[125] Offit also added in the July 22 draft representations that (1) Cresswell, Morgan, and five other EagleForce Associates employees had executed releases for any profit sharing plan and (2) neither Salah, Cresswell, nor any member of Salah's family have any legal or equitable ownership interest in EagleForce Associates or EagleForce Holdings.[126] In Rogers's August 19 draft, he bolded and bracketed Offit's additions and noted "[CAMPBELL] CANNOT

---

[123]    JX 72.

[124]    JX 92.

[125]    JX 52, § 4.3(b); JX 58, § 4.3(b); JX 78, § 4.3(b).

[126]    JX 50, §§ 4.3(d), 4.3(e).

28

GUARANTEE THIS. WE NEED TO DISCUSS."[127] I find that at least as of August 19, Offit and Kay were both aware of the fact that EagleForce Associates had not received releases from the SARs holders.

On August 27, Offit sent another round of revisions to the LLC Agreement and the Contribution Agreement to Rogers, Kay, and Campbell with a cover email stating "[p]lease confirm your acceptance of the terms of these agreements. Please commence preparation of schedules needed for closing."[128] The date on the front of and in the first paragraph of the draft Contribution Agreement remained blank in the August 27 version. And Section 3.1 of the agreement stated, "the closing of the Transactions (the 'Closing') shall be held at the office of the Company, commencing at 10:00am local time on the date hereof (the 'Closing Date') or at such other time and place as the Parties may agree upon in writing."[129]

The draft Contribution Agreement referenced schedules that supplemented the representations and warranties in the agreement and that listed the property Campbell was to contribute. And the draft stated in the recitals that "[t]he parties hereto desire to set forth certain representations, warranties, and covenants made by each to the others as an inducement to the consummation of such transactions, upon

---

[127]   JX 58, §§ 4.3(d), 4.3(e).

[128]   JX 68.

[129]   JX 71, § 3.1.

29

the terms and subject to the conditions set forth herein."[130]  Schedule 2.2(b) listed the intellectual property that Campbell planned to contribute.[131]  But the other schedules remained incomplete.  The August 27 version of the Contribution Agreement states, "Campbell shall assign to the Company, and the Company shall be obligated to assume, and shall assume, those agreements set forth on Schedule 3.5 attached hereto . . . ."[132]  Sections 4.20(d) and 4.20(f) make clear that Schedule 3.5 includes all of Campbell's intellectual property license agreements.[133]  But Schedule 3.5 is blank.[134]  The agreement also states, "Schedule 4.3(a) sets forth, as of the date hereof, (i) the number and class of authorized securities for each Targeted Company, (ii) the number and class of Targeted Companies Securities for each Targeted Company and (iii) the number and class of Targeted Companies Securities held of record by Campbell for each Targeted Company."[135]  But Schedule 4.3(a) is blank except for one line of bracketed text, which states, "[Also describe SARS

---

[130]  *Id.* Recital D.

[131]  *Id.* Sched. 2.2(b).

[132]  *Id.* § 3.5.

[133]  *Id.* §§ 4.20(d), 4.20(f).

[134]  *Id.* Sched. 3.5.

[135]  *Id.* § 4.3(a).

30

Plan]."[136]  Section 4.12(c) of the August 27, 2014 Contribution Agreement states, "[e]xcept as set forth on Schedule 4.12(c), neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, . . . will . . . accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit . . . ."[137]  Schedule 4.12(c) is also blank.[138]

Many of Campbell's representations, warranties, and covenants related to the EagleForce businesses reference schedules that also are blank.  The draft Contribution Agreement refers to the "Campbell Disclosure Schedules."[139]  And that term is defined as "the schedules prepared and delivered by Campbell for and to the Company and dated as of the Execution Date which modify (by setting forth exceptions to) the representations and warranties contained herein and set forth certain other information called for by this Agreement."[140]  But none of those schedules were ever completed.  For example, Schedule 4.6 is supposed to list any contractual liabilities outside the ordinary course of business for EagleForce

---

[136]     *Id.* Sched. 4.3(a).

[137]     *Id.* § 4.12(c).

[138]     *Id.* Sched. 4.12(c).

[139]     *Id.* Ex. A.

[140]     *Id.*

Associates and EagleForce Health;[141] Schedule 4.9 is supposed to list all real property leases, subleases, or licenses to which EagleForce Associates or EagleForce Health is a party;[142] and Schedule 4.15(a) is meant to set forth any pending legal proceedings involving EagleForce Associates, EagleForce Health, or their affiliates, including Campbell.[143] All of those schedules are blank.

The version of the Contribution Agreement that Offit sent with his August 27 email stated "OK DRAFT 8-26-14" on the first page.[144] The version of the LLC Agreement that he sent did not have that notation, but the LLC Agreement was an exhibit to the Contribution Agreement.[145] Rogers was out of town when Offit sent the August 27 draft Transaction Documents, and Offit received his out-of-office reply.[146]

### 8. The events of August 28, 2014

On August 28, 2014, Kay and Campbell once again met without their lawyers. Kay and Campbell both testified that Kay came to EagleForce Associates's offices

---

[141]   *Id.* § 4.6.

[142]   *Id.* § 4.9.

[143]   *Id.* § 4.15(a).

[144]   JX 71.

[145]   JX 73; JX 71, Ex. B.

[146]   JX 74.

with Katrina Powers for the purpose of having Campbell and Kay sign the Transaction Documents.[147] Campbell was busy when they arrived but met with them briefly.[148] Because Campbell had to finish meeting with EagleForce developers, Kay and Powers left to go to a restaurant five minutes away.[149] While Kay and Powers were at the restaurant, Kay and Campbell sent several emails to each other. First, Cresswell sent a non-disclosure agreement to Kay and Bryan Ackerman, the Sentrillion general counsel, with Campbell on copy.[150] Campbell replied asking Cresswell not to "forward this information outside of the company until I have had a chance to review."[151] Kay responded, "[w]hat are you talking about outside the company? We just talk [sic] 3 minutes ago. I will handle my swim lane."[152] About ten minutes later, Kay wrote "1) Bryan is inside not outside. 2) For the record I will handle all NDA contacts."[153] In reference to earlier emails regarding the NDA, Campbell wrote to Kay, "[a]s you can see I am not on the mail routing and this is a

---

[147]    Tr. 329 (Kay); Tr. 988 (Campbell); Tr. 267 (Powers).

[148]    Tr. 329-30 (Kay).

[149]    *Id.* at 330.

[150]    JX 75.

[151]    *Id.*

[152]    *Id.*

[153]    *Id.*

33

bit troubling. Only you can make these folks know that we are equal partners."[154] Kay replied, "[e]veryone knows we are equal . . . . Please clarify w[ith] Chris and Bryan that NDA are in buss lane [sic] and Rick will handle. And send me the signed document if you want to go forward."[155] Around the same time, Cresswell sent an email strategizing about how to "win" the Special Olympics as a client. Kay responded only to Campbell, stating "[s]orry can't do anything until the agreement documents you have are signed. Did you sign?"[156]

At around 7:00 p.m., Kay and Powers returned to the EagleForce Associates offices. Kay, Powers, and Campbell met for only a few minutes, and both Kay and Campbell signed the versions of the LLC Agreement and the Contribution Agreement that Offit had sent by email on August 27, 2014.[157] Campbell testified that before the signing, Kay told him that Rogers and Offit "were done" with the agreements.[158] Campbell testified that he tried to call Rogers but was unable to reach him because Rogers was out of the office.[159] He testified that Kay tried to call Offit

---

[154]  JX 76.

[155]  *Id.*

[156]  *Id.*

[157]  Tr. 294-95 (Powers); Tr. 332-35 (Kay).

[158]  Tr. 977 (Campbell).

[159]  *Id.*

34

but was also not able to reach him.[160]  Kay, in contrast, testified that he did not call Offit or make any representations about Campbell's lawyer.[161]

After Kay and Campbell signed the agreements, Campbell walked around his desk and embraced Kay and Powers.[162]

### 9. The aftermath of the August 28 signing

On August 31, 2014, Kay and Campbell had breakfast with Said Salah and discussed his involvement in the EagleForce businesses going forward, but they did not resolve the SARs issue.[163]  And after the meeting, on September 2, Salah wrote in an email to Kay and Campbell, "I congratulate both of you on your commitments in forging this partnership, and thank you again for recognizing the unwavering commitments I have displayed towards the success of EagleForce."[164]

On September 9, after Rogers returned from vacation, he sent revised drafts of the Contribution Agreement and the LLC Agreement to Offit.[165]  Rogers did not

---

[160]    *Id.* at 978.

[161]    *Id.* at 334 (Kay).

[162]    *Id.* at 240 (Powers); *id.* at 332 (Kay).  Kay and Powers testified that Campbell hugged each of them after signing the Transaction Documents.  Campbell testified at trial that instead of a hug, he gave Kay a dap handshake. *Id.* at 988 (Campbell).

[163]    JX 80.

[164]    *Id.*

[165]    JX 83.

know that Kay and Campbell had signed the documents at that time,[166] and Offit never told Rogers that the escrow agreement for the signature pages was no longer in effect because Kay and Campbell had signed the agreements.[167] In his September 9 email, Rogers noted two outstanding issues related to the Contribution Agreement. First, the new SARs plan remained undefined, and Rogers reiterated that Campbell could not represent (1) that certain EagleForce Associates and EagleForce Health employees had executed releases or (2) that neither Salah, Salah's family members, nor Cresswell had any legal or equitable interest in EagleForce Associates or EagleForce Health.[168] Rogers commented as follows:

> THERE IS STILL MUCH THAT NEEDS TO BE CLARIFIED HERE: (1) We are not confident that we have all of the SAR Plan offers; (2) Burden of the SARs should not be solely on [Campbell] because [Kay] authored it; (3) Chris Cresswell's offer was developed by [Kay]; (4) There was a discussion about the company taking responsibility for the SARs up to a certain level. We need to understand what percentage of SARs was originally granted to understand the ultimate impact on [Campbell].[169]

---

[166] Tr. 827 (Rogers).

[167] *Id.* at 831.

[168] JX 84, §§ 4.3(d), 4.3(e).

[169] *Id.* § 4.3(d).

Second, Rogers stated that financial representations in the Contribution Agreement regarding the status of EagleForce Associates and EagleForce Health would be "quite difficult to complete" because Rogers had no financial information regarding the companies and believed that Kay had that information for the previous six months.[170] As to the LLC Agreement, Rogers removed the provision governing how Mitchell Johnson's successor as the third director on the subsidiary boards would be chosen.[171] And Rogers added a provision requiring that Campbell and Kay always vote in favor of increasing Campbell's salary to be commensurate with similarly situated officers of similar companies.[172] The record does not indicate that Campbell had previously demanded that his salary be increased to reflect industry standards.

In September 2014, Kay and Campbell continued to discuss the missing aspects to their agreement. On September 16, 2014, Campbell provided certain EagleForce billing information to Kay in an email and wrote, "[a]ttached is the invoice and summary related to outstanding billings as required from me related to closing."[173] Campbell stated that Kay's staff had access to all of the information

---

[170] JX 83.

[171] JX 86, § 4.1.8.

[172] *Id.* § 4.1.8(b).

[173] JX 88.

required to create a balance sheet and income statement.[174] Kay responded asking for clarification and wrote, "[w]e need to complete the paperwork so I can fully fund."[175]

Offit, Rogers, Kay, and Campbell had a conference call on September 17 to discuss Rogers's proposed changes to the August 28 agreements.[176] Offit testified that Kay stated on the call that he was willing to discuss potential amendments to the agreements but was not willing to rescind and re-execute them.[177] But Rogers did not remember the contents of that call.[178]

On October 7, 2014, Kay sent an email to Jashuva Variganti and Campbell asking whether Variganti had distributed the paychecks issued October 6 to the EagleForce Associates employees and asking that if they had not been distributed that the checks be returned to Kay for him to distribute.[179] Campbell responded, requesting that Kay avoid communicating with the EagleForce staff and stating, "we remain un-closed and this opportunity still does not have the remaining elements in

---

[174] *Id.*

[175] *Id.*

[176] Tr. 106 (Offit).

[177] *Id.*

[178] *Id.* at 855-56 (Rogers).

[179] JX 91.

agreement."[180]  Kay responded on October 8, stating in part, "[w]e have signed our agreements and are awaiting the exhibits.  [Offit] told me that [Rogers] has 2 open issues" related to the boards of directors of the subsidiaries and the SARs program.[181]  Campbell did not respond to the October 8 email.[182]

Negotiations stalled for much of the rest of October 2014.  On October 15, Rogers sent an email to Offit stating, "[i]t seems that the 'stall' in getting this deal done is clearly the modification to Said's and his brother's deal.  We can argue over all the reasons as to why this isn't happening, but the fact is that [Kay] wants [Campbell] to deal with it, [Campbell] wants [Kay] to deal with it and, as a result, nothing is happening."[183]  Offit did not respond until October 21 when he wrote, "Rick is away.  I have a call into Rick and I'm looking for an update."[184]

On October 28, Kay emailed Campbell, Rogers, and Offit stating, "[w]hat else can we do together to get this done.  I understand we have signed the deal but need the exhibits."[185]  Campbell responded, stating in part, "[t]he signatures on the drafts

---

180      *Id.*

181      *Id.*

182      *Id.*

183      JX 92.

184      *Id.*

185      JX 93.

did not represent the completed document which remains not completed given the two or three remaining items."[186] He also wrote, "I have closed/settled the only item that the Bankruptcy Atty indicated could cause any issue. . . . I would ask that the responsibility for me to re-open the Bankruptcy be withdrawn from consideration/requirement."[187]

In November 2014, Kay and Campbell's relationship became more contentious, as Kay and Offit took the position that the August 28 Transaction Documents were binding contracts and that Campbell was in breach by failing to contribute his intellectual property and reopen his bankruptcy.[188] Kay nevertheless continued to fund the EagleForce Associates payroll into February 2015.[189]

Finally, on February 18, 2015, Campbell sent an email to Offit, Rogers, Kay, and Cresswell stating as follows:

> [W]e have reached an impass [sic] that we are unable to resolve. I would respectfully request that the atty's get together to discuss the means and methods for us to close this matter and allow us to move on. We have booked the funding as a loan and will proceed with amending the

---

[186]    *Id.*

[187]    *Id.*

[188]    JX 97.

[189]    JX 106.

existing documentation in a means that is reasonable for us both.[190]

On March 17, 2015, Eagle Force Holdings and EF Investments filed this lawsuit to enforce the August 28 Contribution Agreement and LLC Agreement.

## C. This Litigation

Plaintiffs filed the original complaint in this case on March 17, 2015 and the First Amended Complaint—the operative complaint—on June 5, 2015 (the "Complaint"). Vice Chancellor Parsons entered an interim relief order on July 23, 2015 (the "Order"). The Order is designed to give EF Investments regular access to information regarding EagleForce Associates and EagleForce Health during the pendency of this litigation. Under the Order, Campbell must notify Plaintiffs ten days before either EagleForce Associates or EagleForce Health enters certain transactions, and Plaintiffs have a right to object in writing. If Plaintiffs object, Campbell cannot engage in a transaction covered by the Order without an order of this Court. The most expansive advanced notice provision of the Order requires ten business days' advanced notice for any transaction or series of transactions with a single person over $5,000 in value in the aggregate. Any such advanced notice must include the text "**NOTICE TO PLAINTIFFS OF PROPOSED ACTION BY DEFENDANT**" in bold type under paragraph 4 of the Order. Further, the Order

---

[190]     JX 103.

requires regular reports regarding the EagleForce Associates and EagleForce Health businesses. The reports include weekly reports describing all sales or distribution leads regarding the Disputed IP, weekly bank statements, weekly accounts receivable and payable reports, and payroll statements every two weeks.

On May 27, 2016, Plaintiffs moved to hold Campbell in contempt for violations of the Order. The Court held an evidentiary hearing on the motion for contempt on August 31, 2016. At the end of that day, the Court ordered the parties to return the next day to complete the hearing. Plaintiffs' attorneys appeared on September 1, 2016, but Defendant did not appear. The Court rescheduled the remainder of the hearing for September 8, 2016 and completed the hearing that day. At the September 8, 2016 hearing, the Court held that Campbell failed to provide Plaintiffs with advanced notice before withdrawing approximately $100,000 in accrued unreimbursed expenses from EagleForce Associates and paying approximately $38,000 in vendor fees. On December 15, 2016, the Court ordered Campbell to pay Plaintiffs' attorneys' fees for their September 1, 2016 appearance at this Court when Campbell did not appear as a partial remedy for Campbell's contempt. The Court deferred any further remedy until after the trial in this case in part because the question of this Court's jurisdiction over Campbell remained undecided. Campbell was ordered to pay that portion of Plaintiffs' attorneys' fees on or before December 23, 2016. Campbell deposited a check for the attorneys' fees

into Kay's personal bank account on December 27, 2016, the business day after December 23, 2016.[191]

Beginning on February 6, 2017, this Court held a five-day trial in this case. On March 6, 2017, Plaintiffs filed a supplemental motion to hold Campbell in contempt for additional violations of the interim relief order. The parties filed post-trial opening briefs on March 29, 2017. In connection with Campbell's opening post-trial brief, he also filed a motion to amend the pleadings to conform to the evidence submitted at trial with respect to the defenses of unilateral and mutual mistake. The parties filed post-trial answering briefs on April 7, 2017. On May 5, 2017, the Court heard post-trial oral argument and held an evidentiary hearing on Plaintiffs' supplemental motion to hold Campbell in further contempt of the interim relief order. On May 24, 2017, Plaintiffs filed a second supplemental motion to hold Campbell in contempt for an additional alleged violation of the Order. This Court held an additional evidentiary hearing on Plaintiffs' second supplemental motion for contempt on August 28, 2017. This post-trial opinion also resolves all outstanding motions in this case.

---

[191] Letter to the Court from David Finger, *Eagle Force Hldgs. LLC v. Campbell*, C.A. No. 10803-VCMR, Ex. E (Del. Ch. Jan. 10, 2017).

## II. ANALYSIS

Plaintiffs' Complaint alleges claims for breach of contract and breach of fiduciary duty. Plaintiffs seek an order requiring Campbell to specifically perform his obligations under the Transaction Documents and granting monetary damages to Plaintiffs. In the alternative, Plaintiffs assert claims for fraud and unjust enrichment. Campbell is a resident of Virginia, and he has objected to the personal jurisdiction of this Court throughout these proceedings. In this unusual case, a full trial was necessary to resolve the question of personal jurisdiction because whether Campbell consented to personal jurisdiction in Delaware depends on whether Campbell is bound by the Transaction Documents.[192]

### A. Standards of Review for Contract Formation

Plaintiffs have the burden of establishing by a preponderance of the evidence that Campbell is bound by the Transaction Documents and, thus, is subject to personal jurisdiction in Delaware.[193] "Proof by a preponderance of the evidence means proof that something is more likely than not. 'By implication, the

---

[192] *Eagle Force Hldgs., LLC v. Campbell*, C.A. No. 10803-VCP, at 48-49 (Del. Ch. July 9, 2015) (TRANSCRIPT).

[193] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015).

44

preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose.'"[194]

To enforce the Delaware forum selection clause, Plaintiffs must prove that they formed a valid contract with Campbell.[195] It is well-settled Delaware law that "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[196] "To determine whether a contract was formed, the court must examine the parties' objective manifestation of assent, not their subjective understanding."[197] "If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur."[198]

Chancellor Allen held in *Leeds v. First Allied Connecticut Corp.* that "[i]t is when all of the terms that the parties themselves regard as important have been

---

[194]  *Id.* (quoting *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *12 (Del. Ch. Oct. 14, 2015)).

[195]  The parties raise the question of which jurisdiction's law applies to this case, but they do not brief the choice of law issue. The briefing relies heavily on Delaware law, and neither of the parties asserts that the law of Delaware is in conflict with the law of any other jurisdiction whose law may apply. The Court, thus, will apply Delaware law to all issues addressed in this opinion.

[196]  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[197]  *Trexler v. Billingsley*, 2017 WL 2665059, at *3 (Del. June 21, 2017).

[198]  *Ramone v. Lang*, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006).

45

negotiated that a contract is formed."[199]  Under Delaware's objective theory of contract law, the Court must determine "whether agreements reached were meant to address all of the terms that a reasonable negotiator should have understood that the other party intended to address as important."[200]  "Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative.  Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way."[201]  To conduct such an analysis, courts review "all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations."[202]  "Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties

---

[199]  *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986); *see also CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *15 (Del. Ch. Apr. 21, 2015) ("[A]n enforceable contract must contain all material terms of the agreement and material provisions that are indefinite will not be enforced." (quoting *Gallagher v. E.I. DuPont De Nemours & Co.*, 2010 WL 1854131, at *3 (Del. Super. Ct. Apr. 30, 2010)) (internal quotation marks omitted)).

[200]  *Leeds*, 521 A.2d at 1102; *see also Gillenardo v. Connor Broad. Del. Co.*, 1999 WL 1240837, at *4-5 (Del. Super. Ct. Oct. 27, 1999).

[201]  *Leeds*, 521 A.2d at 1102.

[202]  *Id.*

themselves regard as essential have been expressly or . . . implicitly resolved, the parties have not finished their negotiations and have not formed a contract."[203] "Thus, determination of whether a binding contract was entered into will depend on the materiality of the outstanding issues in the draft agreement and the circumstances of the negotiations."[204]

## B. The Transaction Documents Lack Terms that Were Essential to the Parties' Bargain

Campbell asserts that certain material terms are missing from the Transaction Documents, showing that the parties never came to agreement and rendering the Transaction Documents unenforceable. In particular, Campbell argues that the closing date, all schedules to the Transaction Documents except for Schedule 2.2(b), definitions of the terms "Insurance Claim" and "IP Disclosure Schedule," and aggregate dollar figures for certain representations are missing from the Transaction Documents.[205]

---

[203] *Id.*; *see also J.W. Childs Equity P'rs, L.P. v. Paragon Steakhouse Restaurants, Inc.*, 1998 WL 812405, at *4 (Del. Ch. Nov. 6, 1998) (finding that a letter agreement to sell at least 60 parcels of real property that listed only 17 sites in exhibit A was not a contract to sell property).

[204] *Greetham v. Sogima L-A Manager, LLC*, 2008 WL 4767722, at *15 (Del. Ch. Nov. 3, 2008).

[205] Def.'s Pre-Trial Br. 13-20.

### 1. Kay and Campbell failed to agree on terms regarding the consideration to be exchanged

Campbell's primary obligation under the text of the Contribution Agreement would be to contribute the stock of EagleForce Associates, the membership interests of EagleForce Health, certain intellectual property related to the EagleForce businesses, and certain contractual rights and obligations. The precise scope of that consideration was to be captured in Sections 2.2 and 3.5 of the Contribution Agreement and Schedules 2.2(b), 3.5, 4.3(a), and 4.12(c). But those portions of the Transaction Documents are either blank or inconsistent with the reality of which Campbell, Kay, Offit, and Rogers were aware.

Section 2.2(a) of the Contribution Agreement states that part of Campbell's contribution shall be "all right, title and interest in the Targeted Companies Securities, such that, after such contribution, the Company shall hold all of the Targeted Companies Securities."[206] Section 4.3(a) of the Contribution Agreement provides that "Schedule 4.3(a) sets forth, as of the date hereof, (i) the number and class of authorized securities for each Targeted Company, (ii) the number and class of Targeted Companies Securities for each Targeted Company and (iii) the number and class of Targeted Companies Securities held of record by Campbell for each

---

[206]    JX 78, § 2.2(a).

48

Targeted Company."[207] But Schedule 4.3(a) is blank except for the bracketed text "[Also describe SARS Plan]."[208] Thus, the schedule that was meant to list an important part of the consideration Campbell would provide under the agreement is incomplete.

The objective evidence of the course of the parties' negotiations shows that whether Campbell owns all of the equity in EagleForce Health and EagleForce Associates is not clear. Salah, Salah's brother Haney, Cresswell, and Morgan all have employment agreements that give them some form of equity in the EagleForce businesses.[209] Throughout the negotiation of the Transaction Documents, Kay and Offit were concerned about employee claims for some of the equity of EagleForce Associates or EagleForce Health. And the evidence shows that Kay knew of at least Salah's and Cresswell's claims to EagleForce Health and EagleForce Associates equity.[210] Kay and Campbell's list of thirteen points recognized the problem of the SARs program and began to develop a solution under which Campbell and Kay would each retain equal control,[211] but that was never incorporated into the

---

[207]   *Id.* § 4.3(a).

[208]   JX 79, Sched. 4.3(a).

[209]   May 5, 2017 Hr'g Ex. 6.

[210]   Tr. 653 (Cresswell); Tr. 1094 (Salah).

[211]   JX 56.

Transaction Documents. Instead, Offit included representations from Campbell in the Transaction Documents that Campbell had obtained releases from Cresswell, Morgan, and five other EagleForce employees related to their revenue sharing or profit sharing plans and that neither Salah, Salah's family, nor Cresswell had any interest in the EagleForce businesses. But Campbell never agreed to those representations.[212] To the contrary, in Rogers's August 19 draft, Rogers commented below the representation, "[CAMPBELL] CANNOT GUARANTEE THIS. WE NEED TO DISCUSS."[213] Rogers's comment was removed in Offit's August 27 version, which Kay and Campbell signed on August 28 while Rogers was out of town and unreachable.[214]

Even after the August 28 signing, Kay, Campbell, Offit, and Rogers knew they had not come to agreement on the employee claims for equity and the SARs plan. In the September 9 version of the Transaction Documents that Rogers sent post-signing, Rogers again commented that Campbell could not agree to the representation regarding the employee releases, stating:

> THERE IS STILL MUCH THAT NEEDS TO BE
> CLARIFIED HERE: (1) We are not confident that we
> have all of the SAR Plan offers; (2) Burden of the SARs
> should not be solely on [Campbell] because [Kay]

---

[212]    JX 50, §§ 4.3(d), 4.3(e).

[213]    JX 58, § 4.3(d).

[214]    JX 78, § 4.3(d).

50

authored it; (3) Chris Cresswell's offer was developed by [Kay]; (4) There was a discussion about the company taking responsibility for the SARs up to a certain level. We need to understand what percentage of SARs was originally granted to understand the ultimate impact on [Campbell].[215]

And Rogers included additional questions about the SARs Plan in his September 9 cover email.[216]  As such, both Kay and Campbell recognized that Campbell likely does not own 100% of the equity of EagleForce Associates and EagleForce Health, and Campbell had not obtained releases related to any employees' potential ownership of equity in the EagleForce businesses.  Despite this knowledge, they did not come to agreement on terms that addressed the reality.

Further, Section 4.12(c) of the Contribution Agreement states that "[e]xcept as set forth on Schedule 4.12(c), neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, . . . will . . . accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit . . . ."[217]  Cresswell and Morgan appear to have SARs rights under their employment agreements that automatically vest upon a sale or change of

---

[215]    JX 84, § 4.3(d).

[216]    JX 83.

[217]    JX 78 § 4.12(c).

control,[218] and Kay knew of that fact at least as to Cresswell's SARs.[219] But regardless, schedule 4.12(c) is blank.[220]

Kay and Campbell also did not reach agreement on which contracts Campbell would assign to Eagle Force Holdings as another part of the consideration in this proposed deal. The Contribution Agreement that the parties signed states, "Campbell shall assign to the Company, and the Company shall be obligated to assume, and shall assume, those agreements set forth on Schedule 3.5 attached hereto . . . ."[221] Sections 4.20(d) and 4.20(f) make clear that Schedule 3.5 includes all of Campbell's intellectual property license agreements.[222] But Schedule 3.5 also is blank. Campbell's intellectual property listed in Schedule 2.2(b) is the only portion of Campbell's consideration outlined in the Transaction Documents on which the parties appear to have completed negotiations. Absent definite terms regarding the remainder of the property to be contributed, I find that Campbell and Kay did not come to agreement on the consideration that Campbell would provide in the Transaction Documents.

---

[218]   May 5, 2017 Hr'g Ex. 6.

[219]   JX 84, § 4.3(d); Tr. 653 (Cresswell).

[220]   JX 79, Sched. 4.12(c).

[221]   JX 78, § 3.5.

[222]   *Id.* §§ 4.20(d), 4.20(f).

The precise consideration to be exchanged between Campbell and Eagle Force Holdings was highly material to the parties here. Presumably, the consideration that Campbell would provide to Eagle Force Holdings would directly affect the number of units or the size of the capital account Eagle Force Holdings would provide to Campbell. And division of the equity in Eagle Force Holdings was extremely important to Campbell and Kay. From the beginning of Campbell and Kay's negotiations, they communicated to each other that it was very important that they both be 50% owners of the ultimate holding company. The November 2013 letter agreement provides that both Campbell and Kay would own 50% of the new LLC, and they agreed "to never dilute [their stakes to] less than 50.1% together in order to maintain control. They will also agree that their vote will always be uniformly tied as a single vote thus protecting [Campbell] from complete loss of control."[223] Similarly, the April 2014 letter agreement also contemplated that Campbell would own 50% of "Holdco," and Kay and Campbell together would not be diluted below 51% of "Holdco," a slightly higher threshold than the 50.1% in the November letter agreement.[224]

At the July 7, 2014 meeting at Rogers's office that went late into the night, the parties resolved that Eagle Force Holdings would not issue new equity capital

---

[223]    JX 1, ¶ 5.

[224]    JX 12, ¶ 5.

53

for the additional $5.5 million they wanted to raise. This would allow Campbell and Kay to retain equal control of the entire EagleForce business.[225] Instead, the subsidiaries would issue equity in exchange for new capital, but Eagle Force Holdings would retain 80% control of the subsidiaries.[226] That term was reiterated in the handwritten list of thirteen points to which Campbell and Kay agreed without their lawyers present.[227]

Additionally, on August 28, 2014, approximately one hour before Kay and Campbell signed the Transaction Documents, they exchanged emails that highlight how important it was to both of them that Kay and Campbell both have equal control. Cresswell sent a non-disclosure agreement to Kay and Bryan Ackerman, the Sentrillion general counsel, with Campbell on copy.[228] Campbell replied asking Cresswell not to "forward this information outside of the company until I have had a chance to review."[229] Kay responded, "[w]hat are you talking about outside the company? We just talk [sic] 3 minutes ago. I will handle my swim lane."[230] About

---

[225] Tr. 64-66 (Offit).

[226] *Id.*

[227] JX 56.

[228] JX 75.

[229] *Id.*

[230] *Id.*

ten minutes later, Kay wrote "1) Bryan is inside not outside. 2) For the record I will handle all NDA contacts."[231]  In reference to earlier emails regarding the NDA, Campbell wrote to Kay, "[a]s you can see I am not on the mail routing and this is a bit troubling.  Only you can make these folks know that we are equal partners."[232] Kay replied, "[e]veryone knows we are equal . . . . Please clarify w[ith] Chris and Bryan that NDA are in buss lane [sic] and Rick will handle.  And send me the signed document if you want to go forward."[233]  Thus, just before signing, Campbell reiterated that he and Kay must be equal partners.  And Kay's emails show that equal control was a material term to Kay as well.[234]

---

[231]     *Id.*

[232]     JX 76.

[233]     *Id.*

[234]     Campbell and Kay were concerned about loss of control and dilution in part because they did not trust one another.  *See* Tr. 803 (Campbell).  On April 30, 2014, Campbell wrote to Kay, "I am no longer enjoying coming to work.  I do not think this will work.  Please tell me what I owe you and how we can move forward independently."  JX 130.  And during the spring or summer of 2014, Kay met with Cresswell at a country club in Potomac, Maryland and told Cresswell that Campbell had previously committed fraud.  Tr. 656-59 (Cresswell). Further, on June 30, 2014, Campbell received an email from Kay with what Campbell believed to be a racial slur.  JX 16.  Kay was also particularly concerned about Salah's equity in the EagleForce businesses because he did not work well with Salah.  Tr. 1087-88 (Salah); *id.* at 1174 (Morgan).  Kay made clear in the handwritten list of thirteen points that "[Salah] will be entitled to SAR only if [Campbell] wants to give non-voting equity.  It is from his side.  [Salah] not a CFO.  [Kay] is not obligated at all for [Salah]."  JX 56.

Campbell and Kay planned for Kay to contribute $2,300,000 in cash because $2,300,000 was the value of Campbell's anticipated contribution.[235] To the extent Campbell's actual contribution was less than originally contemplated, the negotiating parties would have to confront the issue of how the precise assets Campbell contributes to Eagle Force Holdings would affect the number of units Eagle Force Holdings issues to Campbell—and, in turn, which party obtains control over Eagle Force Holdings. Campbell and Kay acknowledged this reality both before and after the signing.[236] As such, the objective circumstances of the parties' negotiating history show that Sections 2.2(a) and 3.5 of the Contribution Agreement and Schedules 4.3(a) and 4.12(c)—which would have listed Campbell's holdings in EagleForce Associates and EagleForce Health, any Cresswell, Morgan, or Said or Haney Salah holdings in those companies, and any holdings associated with the SARs Plan—and Schedule 3.5—which would have listed the contract rights and liabilities Campbell planned to contribute—related to terms that the parties considered essential and on which they had not completed negotiations.[237]

---

[235] JX 12, ¶ 6.

[236] JX 56; JX 84, § 4.3(d).

[237] *J.W. Childs Equity P'rs, L.P. v. Paragon Steakhouse Restaurants, Inc.*, 1998 WL 812405, at *3 (Del. Ch. Nov. 6, 1998); RESTATEMENT (SECOND) OF CONTRACTS § 33 (AM. LAW INST. 1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").

Plaintiffs contend that Campbell was obligated to provide the schedules. They are referenced as the Campbell Disclosure Schedules in the Contribution Agreement.[238] And that term is defined as "the schedules prepared and delivered by Campbell for and to the Company and dated as of the Execution Date which modify (by setting forth exceptions to) the representations and warranties contained herein and set forth certain other information called for by this Agreement."[239] But the parties were still negotiating on Schedules 3.5, 4.3(a), and 4.12(c). And the evidence indicates that Kay and Campbell had not agreed on who would create certain of the schedules. While both Campbell and Kay appear to have worked slowly, or in some cases not at all, on the Transaction Documents schedules other than Schedule 2.2(b), the evidence does not indicate that they agreed to complete the Transaction Documents without those schedules.[240]

---

[238]     JX 78, Ex. A.

[239]     *Id.*

[240]     This opinion does not address whether Campbell and Kay entered a binding contract (such as the letter agreements) that lacks a Delaware forum selection clause because the Court does not have jurisdiction to reach that question. It also does not address any other theory of liability that may arise from Kay and Campbell's relationship.

### 2. The parties did not assent to the terms of the LLC Agreement separately from the Contribution Agreement

As to the LLC Agreement, the evidence shows that Kay and Campbell did not agree to the terms of the LLC Agreement separately from the closely related terms of the Contribution Agreement. From the beginning of Campbell and Kay's discussions, the two parties sought to combine resources to market the PADRE technology through a well capitalized business.[241] As early as the November 2013 letter agreement, Campbell and Kay wanted to form a new limited liability company in connection with that business venture.[242] And the Transaction Documents that Kay and Campbell signed on the same day repeatedly reference one another,[243] indicating that neither agreement was designed to stand alone. The Contribution Agreement that Kay and Campbell signed states, "[a]t the Closing, the Company, Campbell and EFI shall enter into and deliver the Company LLC Agreement in the form of <u>Exhibit B</u>."[244] Exhibit B to the Contribution Agreement is a placeholder for the LLC Agreement.[245] Unlike the Contribution Agreement, the LLC Agreement that Campbell and Kay signed does not say "OK DRAFT 8-26-14" on the cover

---

[241] Tr. 774 (Campbell); JX 1.

[242] JX 1, ¶¶ 7-8.

[243] JX 78, Recital C, § 2.3; JX 79, § 3.2.1.

[244] JX 78, § 3.4.

[245] *Id.* Ex. B.

page,[246] which suggests that the cover page to the Contribution Agreement was considered the cover page to the Transaction Documents as a whole, and the LLC Agreement was an exhibit. And many of the blank schedules to the Contribution Agreement are actually attached to the LLC Agreement.[247] Further, no one asserts that Campbell and Kay intended to enter into the LLC Agreement separate and apart from a Contribution Agreement.[248] Rather, "the parties intended these two Agreements to operate as two halves of the same business transaction."[249] Thus, the LLC Agreement and the Contribution Agreement rise and fall together. Kay and Campbell did not intend to bind themselves to the written terms in the Transaction Documents, and this Court does not have personal jurisdiction over Campbell through his consent.

## C. Absent Campbell's Consent, This Court Lacks Personal Jurisdiction over Campbell

Without Campbell's consent, this Court cannot exercise personal jurisdiction over Campbell. Plaintiffs do not argue that Campbell is subject to personal jurisdiction in Delaware pursuant to the Delaware long-arm statute. They do

---

[246] *Compare* JX 78, *with* JX 79.

[247] *See* JX 79 (including Schedules 4.3(a) and 4.12(c)).

[248] *See* Tr. 5; Pls.' Opening Br. This does not mean that Campbell and Kay did not form a business entity. It simply means they had not completed negotiations on the Transaction Documents, which include the LLC Agreement.

[249] *E.I. DuPont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985).

contend that Campbell became a member and manager of Eagle Force Holdings by executing the April 2014 letter agreement and, thus, impliedly consented to personal jurisdiction in Delaware under Section 18-109(a) of the Delaware Limited Liability Company Act.[250] The April 2014 letter agreement "amends the letter agreement that [Campbell and Kay] executed on November 27, 2013 that was dated as of November 15, 2013."[251] The November 2013 letter agreement states that Campbell and Kay "will form a new LLC entity and/or a series of industry specific LLC's [sic] verticals in Virginia."[252] And the April 2014 letter agreement states that "a new LLC will be formed to serve as a parent entity ('Holdco')"[253] without any mention of Delaware. Instead, it states, "[t]his letter agreement is legally binding upon the parties and shall be governed by the laws of the State of Virginia."[254] Further, at the time of the April 2014 letter agreement, Campbell did not know that Kay had formed Eagle Force Holdings in Delaware.[255] The only agreements that mention a Delaware limited liability company are the Transaction Documents, which are missing material terms

---

[250]    6 *Del. C.* § 18-109(a).

[251]    JX 12.

[252]    JX 1, ¶ 2.

[253]    JX 12, ¶ 2.

[254]    *Id.* ¶ 18.

[255]    Tr. 991-92 (Campbell).

60

and, thus, are not enforceable. The April letter agreement does not serve as implied consent to jurisdiction in Delaware.

Plaintiffs also assert that Campbell actively participated in the management of a Delaware limited liability company and, thus, impliedly consented to personal jurisdiction in Delaware. The facts proven at trial, however, indicate that Campbell managed only EagleForce Associates, a Virginia corporation, and EagleForce Health, a Virginia limited liability company. The record does not show that Campbell ever managed Eagle Force Holdings or any other Delaware entity. As such, Campbell is not subject to personal jurisdiction under Section 18-109.

### D. Campbell's Motion to Conform the Pleadings to the Evidence is Moot

Campbell also has moved under Court of Chancery Rule 15(b) to conform the pleadings to the evidence presented at trial by adding the defenses of unilateral and mutual mistake to his answer. But because this Court does not enforce the Transaction Documents, the motion is moot.

### E. The Interim Relief Order Does Not Bind Campbell

Plaintiffs' three motions for contempt allege that Campbell violated the interim relief order. "A party petitioning for a finding of contempt bears the burden to show contempt by clear and convincing evidence; the burden then shifts to the

contemnors to show why they were unable to comply with the order."[256]  "To

establish civil contempt, [the petitioning party] must demonstrate that the

[contemnors] violated an order of this Court of which they had notice and by which

they were bound."[257]

> The party charged [with contempt] is always at liberty to defend his disregard of the court's order by showing that the order was void for lack of jurisdiction.  In a contempt proceeding based upon the violation of an injunction, the only legitimate inquiry to be made by the court is whether or not it had jurisdiction of the parties and of the subject matter.  Subject to this limitation the court will not listen to an excuse for the contemptuous action based upon an argument that the order in question was imperfect or erroneous.  No person may with impunity disregard an order of the court having jurisdiction over the subject matter and of the parties.[258]

Because this Court lacks personal jurisdiction over Campbell, he was not bound by

the Order and cannot have committed contempt by violating the Order.  Plaintiffs'

motions for contempt are denied.

---

[256]  *TR Inv'rs, LLC v. Genger*, 2009 WL 4696062, at *15 (Del. Ch. Dec. 9, 2009).

[257]  *Id.* (quoting *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997)) (internal quotation marks omitted).

[258]  *Mayer v. Mayer*, 132 A.2d 617, 621 (Del. 1957), *quoted in Cohen v. State ex rel. Stewart*, 89 A.3d 65, 90 n.115 (Del. 2014).

## III. CONCLUSION

For the reasons stated herein, this Court lacks personal jurisdiction over Stanley Campbell, and the Complaint is dismissed.  Defendant's motion to conform the pleadings to the evidence is denied as moot.  Plaintiffs' motions for contempt are denied.

**IT IS SO ORDERED.**